Arguments not to exceed 15 minutes have been tried. Mr. Rosenberg, for the appellant, you may proceed. Thank you. On behalf of Enrique, I thank you for this opportunity and reserve 5 minutes for rebuttal. Now, this court's recent Bishop decision provides guidance on how the cat's paw issues should be evaluated in light of the Supreme Court's Nassar decision. The Bishop court found Nassar's but-for causation occurs if a non-decision-maker's performance reviews played a role in the decision-maker's termination of the plaintiff. And here, the causation standards of Nassar and Bishop are satisfied for at least three reasons. First, at least 30 different facts collectively show non-decision-maker's conduct was the but-for causation of Enrique's denial of tenure at the College of Pharmacy level, and these facts far exceed the five facts deemed sufficient for a similar finding in Bishop. Our brief details direct evidence in at least 11 examples of evidence of Straub's first and second prongs with regard to Drs. Balkrishnan and Nahata, at least 19 facts establishing Dean Brueggemeyer's retaliatory animus and subsequent attempts to cover his animus or the animus of others, and at least 11 facts establishing Straub's first and second prong with regard to Dr. Berkey. The second major finding a reasonable juror would likely make is that non-decision-makers concealed evidence of retaliatory animus by providing false and misleading information to the decision-makers, such as Provost Aluto. Now, the Bishop decision addresses a third related major finding that's critical here, and that is that a reasonable juror would likely find at least 10 additional reasons to conclude that Aluto's deposition testimony completely undermines his affidavit claim that he says that Enrique's tenure was denied for reasons other than the bias of non-decision-makers. Did Bishop have something to do with tenure at a school? Absolutely, and I think if I give you the 10 reasons, you'll get a better handle on the tenure. It is a tenure decision, and Dean Brueggemeyer, who is the dean of the college that Enrique is at, he tricked Aluto, who is the decision-maker in this case, he's the provost, into believing that certain division faculty members obtained federal-funded grants prior to obtaining tenure. Now, if Provost Aluto would have done the careful review that his affidavit said of Enrique's dossier, he would have known he was being tricked, because that dossier contained many explicit examples of tenured faculty members within the division who did not have federal funding. It also detailed how up-and-coming tenured faculty below Enrique were not being required to have federal funding. Now, Provost Aluto admitted in his deposition that he had never even read Enrique's publications, one of the largest portions of this dossier. Aluto admitted he lacked the training, knowledge, and expertise necessary to evaluate Enrique's publications and or research. Aluto admitted that the committee members that he asked to assist him in this evaluation, they lacked the professional experience in Enrique's academic discipline. Aluto also acknowledged the committee that assisted him never investigated the non-decision-maker's retaliatory animus, which was extensively detailed within the dossier. The sixth fact is Brueggemeyer or the dean's false statements, which caused Provost Aluto to dismiss concerns about a faculty member named Balkrishnan. Balkrishnan, during the faculty vote, right when the thing gets started, Balkrishnan says to all the people voting on the committee, hey, the EEOC, OSU, and the college found that Enrique's Title VII claims or complaints with OSU HR were dismissed as without merit. And I'd like you that are voting on that to take that into consideration when you cast your vote today. That is direct evidence of retaliation, and it's also false. Because OSU HR explicitly identified disciplinary procedures that should have been taken against Balkrishnan, including one which was to keep him from even being in the 10-year vote. Didn't your client blow the timeline on that issue in terms of the retaliation or the mischaracterization? Is that one of the issues that come up in relation to whether there should be tolling? I think you're right, but tolling is a separate issue. In the Katzpah situation, for example, Balkrishnan's comments in the meeting, those are clearly in front of this court with regard to Aluto, whether he was to Katzpah or not. Now, there's a separate issue in front of this court as to whether that was an independent cause of action, which would fall under equitable tolling, but that's a completely separate issue. Even as this court were to find there is no equitable tolling. Okay, your argument goes to the Katzpah. I'm purely talking about Katzpah right now. I'm talking about the ways in which the non-decision-makers lied and deceived the decision-maker by providing false information. And getting to your point, Your Honor, what had happened when the decision-maker, which was Aluto, sends out this woman, she's Anderson, Vice Provost, and says, could you tell me what happened? They all lie to and say, oh, he was called out of order right away. He was never called out of order right away. Now, there's many other examples, but as my time is running low, I want to jump back in, unless you have a question, to cover the other facts. But there are, at least in the briefs, over 50 facts which establish the first three elements of Straub. And as a result, I'd ask this court to find that only a jury can render a decision on Enrique's Katzpah claim. Next, I'd like to shift to the district court's handling of Enrique's expert witness, Dr. Schondelmaier. First, the district court completely ignored Dr. Schondelmaier's testimony on items the district court said he could testify about. This error requires reversal of the district court because Schondelmaier's testimony on these issues supports Enrique's claims that Aluto never broke the causal chain created by the non-decision-makers. The second issue related to the expert witness is the – do you have a question, Your Honor? Well, I thought that the conclusion by the district court was that in order to demonstrate breaking of the causal chain, you'd have to show what, in fact, Dr. Aluto was thinking. And that's – I'm glad you brought – that's what the court said, but that was not in the expert's – expert report. What he said was – Schondelmaier said that non-decision-makers' inconsistent, inaccurate, misleading, or false information more likely than not. He did not get – but that – but the question, Your Honor – Suppose we say, okay, we're listening, we're listening, but we still don't have actual evidence of what was going on in Aluto's head, except from Aluto. Well, he's not testifying to that. The ultimate issue in this fact is whether Aluto conducted an independent investigation that broke the causal chain. That's the ultimate issue of fact. Schondelmaier provides no evidence on that topic. He merely said that Aluto received inaccurate information from the non-decision-makers. Aluto could have and should have gone out and obtained somebody with unbiased knowledge, with the skill set to understand Enrique's dossier, look it over, and give him an opinion. That never happened. But you're saying the district court ignored Schondelmaier's testimony that all of this, at least inaccurate if not deceitful information, was ever looked at by Aluto? Yes, I think it's best to look at what the judge said. But the judge didn't say that he didn't look at it. No, he did, Your Honor. What the judge said was Schondelmaier was allowed to testify on three things, the nature and quality of Enrique's publications, the kind of grant funding available in Enrique's field, and the tenure process in general for professors of pharmacy. So Schondelmaier does that. He provides that testimony, which the judge completely ignores. For example, with the federal grant funding, which is really a key part of this case, Schondelmaier says that it was like asking an NFL draft pick to become the MVP in the NBA. It was such a high standard that nobody met it. And Schondelmaier should know because he's been in this field a long time. So when Schondelmaier provides his testimony, the judge just blows it off. That testimony specifically addresses the fourth element of Enrique's prima facie case and pretext, which go to solving the outstanding issues in this case. And I see I'm down to three seconds, so I better ask if I can get any questions. No. Okay. Thank you. May it please the court. The district court granted summary judgment on this case. This is a retaliation case, and it is a tenure case. And the standard in tenure cases for the court is very high because tenure in reality grants someone a lifetime appointment. And in this case, Provost DeLutto, who is the final decision maker on a denial of tenure, reviewed all of Dr. Sione's complaints, and Dr. Sione's complaints went to two things. It basically went to two things. The rules for tenure were not followed by various people, many of whom were not supervisors, for cat's paw purposes, and certainly under Vance. You're saying they're on the same level, these other people? They're co-faculty members. Now, the people who vote on tenure are the next rank up, but they would never qualify as supervisors under Vance, the Vance case. They are not decision makers. What they do is vote, and it's a recommendation that goes to the next level, that goes to the next level. The process is very elaborate. Do we have to decide in this case whether or not co-workers doing some of these things are sufficient for purposes of finding cat's paw liability? Nobody seems to have really come down on that yet. No one has come down on that yet, and, of course, Vance is new. Vance was a harassment case, not a retaliation case, and it's a new case. So, no, I don't think anyone's come down on that issue. I don't think it's actually important to us, but it's not determinative because the Nassar case made the standard in a retaliation case a but-for standard. And in this case, the district judge was, of course, reviewing it on a motivating factor standard, but even at that standard he found that they did not meet that standard in this tenure case, that Aluto's decision was retaliation under the cat's paw theory. In addition, but now we have a higher standard, a but-for standard, and these facts of this case clearly do not meet a but-for standard of retaliation. And even though Staub itself talks about a motivating factor, Staub was a USERRA case, Staub was not a retaliation case, Staub was decided before Nassar, and the US Supreme Court was emphatic in Nassar that the standard in a retaliation case now is a but-for standard, and that would mean that but-for retaliation, Provost Aluto would have granted Dr. Sioni tenure. There is absolutely no evidence of that. The evidence is absolutely clear that Provost Aluto himself looked at the issues here, and the issue was that Dr. Sioni raised was whether there was a violation of the rules for tenure at Ohio State and whether certain letters that were written by external reviewers and the dean and the chair misrepresented or lied, basically, about the core dossier, the academic record of Dr. Sioni. The core dossier is provided and done by Dr. Sioni, and the materials in there is what he submitted. The materials in the core dossier are not as what was implied, just some publications that they're complaining that Provost Aluto didn't read all of. It also has a summary that's prepared by Dr. Sioni that says what his research is, what his research path is, what he plans to do in the future. He did that himself? He did that himself. And Dr. Aluto looked at that? He certainly did, Your Honor, and his affidavit is quite clear about the process he took, and counsel says that Dr. Aluto's deposition conflicts with his affidavit. It does not. Did he say he didn't read something that counsel's claiming? He didn't read all the pages of every publication of Dr. Sioni's that were submitted. That's true. They are in the field of pharmacy. Provost Aluto, Dr. Aluto, his role as the provost of the university is to decide tenure for people in every field. I couldn't tell you how many fields there are at The Ohio State University. So he can't be an expert in all those fields, but he doesn't need to be an expert in all those fields. He reads the dossier. He reads the summary of what the person says they did, what they planned to do, and what he does is he compares it to his view of whether this academic record and this work is sufficient to get tenure at The Ohio State University. I wonder if there's a question of fact as to whether Aluto made his decision based on inaccurate information, some of which may have been deliberately provided him for purposes of retaliation and wrong information and all of that, and that really determined the outcome of the tenure decision. Even with this but-for standard, is it possible that there's a question of fact if the decision was made wrongfully procedurally and also based on wholly inaccurate information, if that's one of the arguments that we're being presented with? Well, Your Honor, one set of the allegations were that the rules at Ohio State had been violated. Provost Aluto reviewed the rules. He compared what happened, and there's no dispute about what the plaintiff claims happened, the appellant claims happened. He compared what he says was wrong to the rules, and he said, No, that letter, you can't submit that letter at the vote meeting of the faculty. You submit that letter as a rebuttal after the dean has written his letter. The other rules were whether- Of course, in addition to the letters, Aluto has provided dossiers of additional information about the publications and all of that and other people's views of the person being considered for the tenure decision. As I understand, there was just a lot of information. Well, he has the core dossier, which is all the materials that Dr. Sione himself prepared, and he also has the letters from external reviewers and the letters from the dean and the chair. What Dr. Aluto did was he compared those letters to the core dossier to see if there was any factual information in those letters that conflicted with what was in the core dossier. And those letters, the main thrust of many of those letters- Now, he complains about two of those letters of Dr. Kraling and Dr. Gaither, but others of those letters were equally negative about Dr. Sione's performance, and the theme across all of the letters from the outside reviewers, the faculty, and all the way up, and Dr. Aluto's own view is that his research lacked focus. It lacked a path of research to become an expert in an area. They all had the same theme all the way up. Everybody all the way up had recommended denial of tenure. But even at that, Dr. Aluto referred this to what's called the University P&T Committee. That's the committee that I believe Council was referring to. The University P&T Committee are professors from the entire university, and in fact people from the College of Pharmacy were not permitted to sit, in this case, on that committee. So they're not experts in his field. They are experts in academia. And what they do is they look at the academic record. Now, he's complaining because they only looked at the academic record. That's what they're to do. They looked at the academic record. They reached the same conclusion. They didn't even know Dr. Sione. They reached the same conclusion. Lack of focus, lack of clear research path, lack of clear plan for research. They all reached the same conclusion, and that was a five-person negative vote. Did they look at these documents that his council claims are false? Well, they would have looked at the external review letters, and they would have looked at the letters that came up. But they also would look at the core dossier. They would look at his work. And you don't have to read every publication because the cover summary that he pairs tells you what they are. You look at the names of the publications, the summary at the beginning of the publication. You know what the publication's about. You know that this one's about one thing and this is about something else and this is about something else, and that's what they all say. To what extent does the record give us any indication that they would have been influenced by this question of whether or not Dr. Sione was able to or had attempted to get federal grants to support his research? None of them talked about the federal grants. And the issue wasn't he didn't have enough federal grants. Some of the letters do talk about he had over $200,000 in grant money, but many of them talked about the fact that it didn't come from sources that were peer-reviewed. It was more money from contracts, from entities to do work. But as far as federal funding, that wasn't really discussed, and it certainly wasn't discussed by Aluto. Aluto said it was on his whole academic record. He didn't mention federal funding at all. And the thing I think that's key here is that all of these allegations that Dr. Sione's making, one, they are not claims in this case. They have never been determined to be retaliatory actions by anyone, and our position is they were not. Maybe that's what we're supposed to decide in this lawsuit. What would you say about the contention that many of these letters were motivated by discriminatory animus or retaliatory animus? If a fact finder were to determine that to be so, what difference would that make in our case here? Well, Your Honor, there's absolutely no evidence in this case that any of these outside reviewers were biased against Dr. Sione. There is absolutely no evidence of that in this case. And in addition, if you look at the letters, he complains about two of the external reviewers being biased, but two other of the external reviewers write just as negative letters. He doesn't complain about them being biased. But there is no evidence of bias by the outside reviewers, and when their letters are compared to the core dossier, the things they complain about are evidenced in the core dossier that Dr. Sione prepared. The claims, these six claims, these six incidents, they're all time-barred. They are not claims in this case. Well, freestanding they would be time-barred. Yes. But the real question seems to me to be to what extent did those things influence the decision that Dr. Aluto made? Looking at this now under the cat's paw theory to satisfy the fourth element of a prima facie case. So I know that we're looking, we have to find a but for here, but I think where it gets confusing is that there is this claim that Brueggemeyer and these various others were biased against him, were retaliating against him for things that he had done, and that it was their activities which misled Dr. or Provost Aluto into coming to the conclusion to which he came. Well, the conclusion that Provost Aluto made was a denial of tenure, and that is based on the individual's academic record. Dr. Aluto had the individual's entire academic record before him, mainly the core dossier that Dr. Sione himself prepared. But the claim is, though, that that's not what Dr. Aluto based his decision on. The claim, as I understand it, is that Dr. Aluto wouldn't have come to that decision but for all of this bad information that he was given by people who gave it, who provided it, with a retaliatory motive. Well, Your Honor, I would say, first of all, there is no, we would assert there was no bad information given to Dr. Aluto, and Provost Aluto looked at all those allegations and looked at them to see if there was a violation. He compared it to the rules. He said, no, this was what the rules said we should do. He compared the letters that he got. He compared all of that to the core dossier and said, no, the core dossier, what papers he wrote lacked focus. What these people are saying is true. There's no lies in these letters from the dean or from the chair. There's no lies in these letters from the external reviewers in the sense that they're supported by the academic record that we have. There's no evidence here that Provost Aluto was duped by anybody, which is what you require for Katzpahl. He knew what Dr. Sione's complaints were. He reviewed them. He compared them to the record. He compared them to the rules. He determined that his opinion, the academic record, did not support tenure at Ohio State University. There's no evidence he was duped by anybody. There was no hiding it. I'm sorry, I'm out of time. The complaints that Dr. Sione made were also all in the record that came to the provost, and he reviewed all those complaints. So he wasn't duped by anybody. Nothing was hidden here. It's not a Katzpahl situation. He had full knowledge of what the allegations were, and so he personally compared the information to the rules and the record and reached the conclusion that tenure was not appropriate here. And the standard here would be that he would have reached the conclusion to give Dr. Sione tenure but for retaliatory animus. There's no evidence he had any retaliatory animus, and therefore this decision should stand and some re-judgment should be affirmed. Thank you. Thank you. Thank you. Thank you. I'd like to briefly address some of your questions and some of the comments. The suggestion, first of all, that federal funding was never an issue is absolutely false. The record shows that certain division faculty were negative on Enrique's tenure because he didn't get the federal funding that Brueggemeyer demanded in his four-year letter. Were these people who wrote the derogatory letters on the same level as your client, or were they supervisors? And that gets to another question that was discussed, the supervisor, whether they're cat's paw. OSU actually never raised that issue on an appeal to come back and attack through the Thompson case, but if you look at Thompson, these folks are clearly supervisors because they are voting on a 10-year decision, which is a decision to hire, and OSU actually used that argument to defeat our equitable tolling argument by saying that once the college makes a decision, there's no more de novo reviews. That's it. That was incorrect, but now they want to have it both ways, but that is in the brief. What's very important here, when OSU is talking about a higher standard, please look carefully at the cases they're citing. They're all distinguishable. Many of them don't even relate to the issues before this court. You mentioned that Bishop case. Is that in your brief? No, actually the Bishop was decided after the brief, and it's in my supplemental, but it's a very important case because it's right on point for this case. Cat's paw, NASR, but-for, it's critical. But what I want to touch on is this external reviewer thing because it's very important that we understand how they were selected. There were some people that sat on a committee that was created in part to address Enrique's OSU HR complaints. They took to calling Enrique a cancer because his complaints about his promotion were a problem. Many of these same cancer committee folks got on the committee to select the external reviewers. Aludo was absolutely deceived on dozens of facts, but one of them was the external reviewers. He was led to believe that they were somehow objectively neutral when in reality Dr. Schondelmayr described them as the most negatively critical panel he could ever think of. Aludo, equally important, is Aludo rejected, let me step back please, because before it goes to Aludo, then it goes to this committee called CAFR. When CAFR got this issue, they looked at these external reviewers and they said two of them were violated OSU rules because their decisions, they couldn't give an unbiased arm's length opinion. They shouldn't have even been asked to serve as external reviewers. So you have Schondelmayr, you have CAFR, and then it comes to the next committee, which was the Faculty Hearing Committee. Now, what did they do with that issue? The same thing the dean did. They rejected it because the dean lied to them. The dean and Nahata and Berkey told these committees that, look, Enrique can't complain about those external reviewers because we gave them the names before we selected and he didn't object. Those are completely false. He got the names after they were selected and he could not object. So there are just dozens of facts on those issues, particularly the external reviewers, which goes, I think, to the heart, Your Honor, of Judge Clay's question about your summary of the factual issues are critical. There are over 30 facts detailed in the brief that talk about non-decision-maker animus and attempts to cover that up. When you look at Bishop, they had five. We've got 30. The materials disputable facts are just monstrously different. It was suggested that Professor Aluto actually read the publications. He admitted he did not read the publications. That was his deposition testimony. And the answer to your question, Judge Siller, about did that committee see what it was that Enrique wrote after the tenure, the answer is no. They did not review it. They told Professor Aluto that they didn't have the resources to review it. Provost Aluto said, I'm not going to give you the resources, and instead, Provost Aluto asked this person named Anderson, you go out and look at what that stuff he wrote was. Anderson talked to Brueggemeyer and Ahada, and those guys told her lies, like the external reviewer story and the federal funding story. And Anderson told that to Aluto, and Aluto believed it. Had he read that stack of paper, he would have known those stories were false. What about your opposing counsel's argument that as to all these letters that were submitted about your client in the process that there's no indication that no, I suppose, evidence as such that those letters were motivated by retaliatory motive kind of thing? So temporal proximity kind of question, causation? Well, not only that, that there needs to be some, I guess the argument is there needs to be some underlying or some sort of evidence that these letters were ill-motivated. Well, there's a lot of, we have temporal connections on almost every single issue I've talked about today. But there are, the retaliatory animus, for example, on the federal funding issue goes back to when Enrique got four-year. Before he got that, Nahada Balchristian screwed it up so bad they had to do it again. So Brueggemeyer does it the four-year, the second time, and he says, I want you to get federal funding before you get 10-year. Enrique files an OSUHR complaint. And OSUHR says to the dean, you've got to take that out of there. We recommend that you not require him to get federal funded grants, but instead let him get what everybody else got. He ignores it. The dean doesn't implement it. He lets it sit in the file and percolate up to the 10-year vote. And that 10-year vote happened within days of the court denying a TRO. And there's so much evidence that I talked about the Cancer Committee. We have Berkey saying that he knew about Enrique's lawsuits. People at the college and around the country were saying there's a problem at OSU. His language is, what the hell's wrong at Ohio State? That's what people were saying, and they were blaming it on Enrique. So there's so much animus. It's very similar to the Bishop case. In the Bishop case, you'll see that what they said is if the workplace is abuzz with knowledge of the employee's protected activities, those can be deemed to the non-decision makers as knowledge. I see I'm out of town. I'm sorry. Thank you, counsel. The case will be submitted.